IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-cr-00004-TMB-KFM |
| Plaintiff, | |
| vs. | **FINAL REPORT AND RECOMMENDATION[1] REGARDING MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING** |
| TERRY LEE KEEHN, II, | [**Docket Nos. 38, 40**] |
| Defendant. | |

## I.   MOTIONS PRESENTED

Before the Court is Terry Lee Keehn, II's, motion to suppress evidence.[2]  Keehn seeks suppression of all evidence derived from a warrant-authorized search of his home and his pickup truck.[3]  The government opposes.[4]  Keehn's application includes a request for a *Franks* hearing.[5]  The Court concludes that the substantial preliminary showing necessary for a *Franks* hearing has not been established.  For the reasons set forth below, this Court denies the *Franks* hearing request and recommends that the District Court, after independent review, deny the motion to suppress at Docket No. 38.

---

[1] This report and recommendation is being issued as a final report and recommendation.  Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge, who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.
[2] Docket No. 38.
[3] *Id.*
[4] Docket No. 45.
[5] Docket No. 40; *Franks v. Delaware*, 438 U.S. 154 (1978).

## II.  SUMMARY

This motion addresses a possession with intent to distribute count that developed near the end of a three month sex trafficking investigation.  Keehn seeks suppression of methamphetamine and heroin found in an olive green backpack discovered in his pickup truck pursuant to a search warrant issued by a state court magistrate.  This Court recommends that the District Court, after independent review, find that in regards to the search for drugs and drug related material, the state court warrant was not supported by probable cause.  Notwithstanding, this Court recommends against suppression because the exclusionary rule does not apply where information in the record establishes by a preponderance of the evidence that the drugs would have been discovered inevitably by lawful means.  Here, the state court warrant authorizing the search of Keehn's home and pickup truck for sex trafficking related devices, such as cell phones, computers, and other electronic devices with internet access capability, was supported by probable cause.  This finding leads to the conclusion that the police inevitably would have discovered the drugs when they inspected the olive green backpack for the electronic devices.  In the alternative, this Court recommends against suppression because, although the warrant application was not supported by probable cause that drugs would be found in the pickup truck, the good faith exception applies. The issuing state court magistrate's warrant here was not so defective as to drugs and drug related materials as to render official reliance on it entirely unreasonable.

Keehn does not directly challenge the issuing magistrate's probable cause determination that probable cause existed to search his home and pickup truck for drugs.  Instead, he brings a motion asking for a *Franks* hearing because he alleges the probable cause determination was based on unreliable, misleading, and stale information about sex trafficking.

This report and recommendation will review the Alaska State Troopers' factually dense search warrant application, evaluate Keehn's various Fourth Amendment challenges, and explain why this Court recommends against suppression of the drug related evidence found in the olive green backpack.

## III.   BACKGROUND

### A.   The Indictment

On February 18, 2016, the grand jury returned a true bill to a one count first superseding indictment charging Keehn with possession with intent to distribute 50 grams or more of actual methamphetamine and with possession with intent to distribute heroin, all in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), (C).[6]

On May 19, 2016, the grand jury returned a true bill to a second superseding indictment.  The second superseding indictment carries the existing drug trafficking offense forward, and adds five sex trafficking counts.[7]  The return of the second superseding indictment does not impact this Court's analysis of Keehn's motion to suppress or his motion for a *Franks* hearing.

### B.   Trooper Sergeant Mike Ingram's Search Warrant Application

The charge against Keehn depends on evidence obtained from the warrant-authorized search of his home and his pickup truck.  Alaska State Trooper Mike Ingram executed the affidavit supporting the search warrant.

This is what Ingram said in his sworn search warrant application.

---

[6] Docket No. 20.
[7] Docket No. 52.

### 1. The text message

On October 22, 2015, Ingram received a copy of a text message sent by a confidential source (CS) to an FBI Agent.[8]  In the October 10, 2015 text, the CS alleged a man involved in sex trafficking activity threatened and harassed a woman who was engaged in prostitution related activities without his consent in Wasilla.[9]  The CS said the man used cell phone number (907) 795-3148 to generate the text.[10]  Ingram traced that number to Keehn and then located his residence.[11]  But Ingram determined that Keehn no longer lived there.[12]  Subsequent efforts by the FBI Agent to record conversations with Keehn were unsuccessful because the agent was unable to contact Keehn.[13]  Accordingly, Ingram broadcast a "police locate" for Keehn.[14]

### 2. The first police contact with Keehn

On December 1, 2015, a Wasilla police officer responded to the "locate."[15]  This officer reported advising Keehn that Keehn's "25 year old daughter, Sara Johnston," died early that morning from injuries sustained in an automobile accident.[16]  The Wasilla officer reported that Keehn now lived at 1670 Kinzi Circle, #4, in Wasilla, Alaska, and that his phone number was still (907) 795-3148.[17]  This number was the same as the one generating the text message the CS

---

[8] Docket No. 38-1 at 8.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*; Ingram's affidavit refers to "Glass Warrant 3AN15-2539SW" in connection with the attempted recordings.  Alaska requires a warrant to record conversations using a confidential informant. *State v. Glass,* 583 P.2d 872 (Alaska 1978).
[14] Docket No. 38-1 at 8.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 9.

gave to the FBI Agent.[18]  Within 24 hours, Ingram determined that vehicles associated with Keehn and with his wife, Casey Keehn, were parked outside the Kinzi Circle address.[19]

### 3. The second police contact with Keehn

On January 2, 2016, a second Wasilla police officer reported contact with Keehn.[20] The Wasilla officer was serving an eviction notice at the Kinzi Circle address when he encountered Keehn, Keehn's wife, and a woman named Sharon Southwell.[21]  Keehn's 2008 red Ford F-250 pickup truck was parked outside the residence. [22]  Keehn gave the officer a new Wasilla address and confirmed his phone number was still (907) 795-3148. [23]  This number was the same number Keehn provided to the first Wasilla officer in December, as well as the number the CS provided to the FBI Agent in October.  While the officer was serving the eviction notice, two unidentified people told the officer there was methamphetamine in Keehn's Kinzi Circle residence.[24]  These two reports were never corroborated because no search occurred.  The officer advised Ingram that everything had been removed from the Kinzi Circle address to a storage facility and that the locks to the residence had been changed.[25]  Near the end of the encounter, the officer arrested Southwell on an outstanding probation revocation warrant in a drug case.[26]

Ingram interviewed Southwell after her arrest.  Southwell said she was friends with the Keehns, that she met them through family, and that she was visiting from Soldotna.[27]

---

[18] *Id.* at 8-9.
[19] *Id.* at 9.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

Southwell told Ingram she was aware that Johnston recently died in an automobile accident.[28] Southwell said Johnston had lived in Wasilla, but did not know if Johnston was associated with Keehn.[29] Southwell denied any personal involvement in the commercial sex trade.[30]

### 4. Scott Hagy alleges Keehn was running a prostitution enterprise

On January 7, 2016, Ingram met with Scott Hagy in Wasilla because Hagy claimed Keehn "was running a prostitution enterprise."[31] Hagy said he was Johnston's stepfather.[32] He told Ingram that Johnston had been working for Keehn as a prostitute when she died.[33] A woman named Ashley Hunter admitted to Hagy that she worked as a prostitute for Keehn and that Keehn used the Kinzi Circle residence for prostitution related activities.[34] Hagy then asserted that Hunter accused Keehn of falsely claiming to be related to Johnston when she died in the accident so he could receive notification as her next of kin.[35] Hagy advised Ingram that Johnston had a cell phone when the accident happened.[36] Hagy indicated that Johnston used two phone numbers.[37] One was (907) 521-2606.[38]

Finally, Hagy showed Ingram several text messages he alleged Keehn sent to Johnston's sister immediately after Johnston's death.[39] In these text messages, the texter advised the sister of Johnston's fatal automobile accident, reported that Johnston had lived with Keehn and his wife, and offered to speak with the sister if "she wanted to talk."[40] These messages came from

---

[28] *Id.*
[29] *Id.* at 9-10.
[30] *Id.* at 10.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at 11.
[38] *Id.*
[39] *Id.* at 10.
[40] *Id.*

Keehn's (907) 795-3148 number.[41]   The (907) 795-3148 number matched the number the CS provided to the FBI Agent in October, the number Keehn gave to the first Wasilla officer in December, and the second Wasilla officer in January.[42]

### 5. Johnston's Galaxy cell phone

Ingram went to the wrecking yard where Johnston's car was towed after the accident to look for Johnston's phone.[43]   He found a badly damaged Galaxy cell phone in Johnston's wrecked vehicle.[44]   Ingram removed the SIM card.[45]   A search of the SIM card revealed that the phone number for the Galaxy cell phone was (907) 521-2606.[46]   This was one of the numbers Hagy said Johnston used.[47]   The search of the SIM card also revealed that (907) 795-3148 was included in the cell phone contact list under the name "You Know !!!!2."[48]   The (907) 795-3148 number was the same number the CS provided to the FBI Agent in October, the same number Keehn provided to the Wasilla officers in December and January, and the same number used to generate the text messages informing the sister of Johnston's death.[49]   Finally, the Galaxy cell phone contact list included the number (907) 414-3467, which Ingram linked to Casey Keehn.[50]

---

[41] *Id.*
[42] *Id.* at 8-10.
[43] *Id.* at 10-11.
[44] *Id.* at 11.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 8-11.
[50] *Id.* at 11.

6. **Drug paraphernalia found in Keehn's hotel room ten days before Ingram's warrant application**

Ingram learned that Keehn and his wife rented a room at the Aspen Hotel in Soldotna the evening of January 3, 2016.[51]  After the Keehns checked out, the hotel decided not to rent to them again "because they found evidence of drug use (used needles and a broken meth pipe) along with blood" in the room after the Keehns departed.[52]  This was ten days before Ingram applied for a warrant to search Keehn's Anchorage residence for drugs.

7. **The third police contact with Keehn**

On January 11, 2016, a Kenai police officer reported contact with Keehn and his wife at the Quality Inn on the Kenai Peninsula.[53]  Keehn called the police because the hotel manager refused to return his deposit.[54]  Keehn and his wife were in his 2008 red Ford F-250 pickup truck when the Kenai officer arrived.[55]  Keehn provided the Kenai officer with an address of 1670 Kinzi Rd., #4, in Wasilla.[56]  Keehn said his phone number was (907) 795-3148 and Keehn's wife said her phone number was (907) 414-3467.[57]  Ingram recognized that both numbers were contacts in Johnston's Galaxy cell phone.   The (907) 795-3148 number Keehn provided matched the number the CS provided the FBI Agent and the number Keehn provided to the Wasilla officers on two separate occasions.

8. **Keehn's recorded conversations with Southwell**

Because jail calls are recorded, Ingram reviewed well over thirty recordings of phone calls Southwell made to Keehn following her January 2, 2016 probation revocation arrest.

---

[51] *Id.* at 12.
[52] *Id.*
[53] *Id.* at 11.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

### a. "Turning tricks"

During a January 4, 2016 call to Keehn at (907) 795-3148, Keehn told Southwell he was in the Aspen Hotel near Kenai/Soldotna and that his wife had lied to him about "turning tricks" in his room with "Kelly."[58] Keehn told Southwell that he did not want that kind of activity happening in his hotel room anymore.[59]

### b. "Hookers"

Ingram listened to a second jail call from Southwell to Keehn that occurred on January 4, 2016.[60] In this recording, Keehn related that he had a "long talk" with Casey Keehn, and said he was tired of having "hookers" as roommates.[61] He indicated that future living arrangements would be limited to "him, [Southwell] and Casey" because "the place was always a mess and he was tired of cleaning up after everyone."[62]

### c. "His Anchorage girls"

Ingram listened to a third jail call from Southwell to Keehn, which occurred on January 5, 2016. In the third call, Keehn said that "he is having his Anchorage girls . . . over to his place in a minute to show them everything they need to do online and phone wise so he does not have to do it anymore" because he is "givin' it up."[63] Keehn explained that he is doing this "so I can show them how to set up their own account for what I do . . . so I'm not going to do that for them no more," that "they need to learn how to do it for themselves."[64] When Keehn repeated

---

58 *Id.* at 11-12.
59 *Id.* at 12.
60 *Id.*
61 *Id.*
62 *Id.*
63 *Id.*
64 *Id.*

that he's "givin' it up," Southwell replied "well good . . . then I won't get questioned about that stuff." Keehn promised to focus exclusively on Southwell and Casey Keehn.[65]

### 9. Southwell plans to live with Keehn following her release

Ingram listened to over thirty jail calls between Southwell and Keehn from January 2, 2016 to January 7, 2016.[66] From these calls, Ingram learned that Southwell would be released from custody, returned to felony probation supervision, and would live in Anchorage with the Keehns in their new apartment near Strawberry Road.[67] The apartment would be rented in Casey Keehn's name so Southwell could live with Terry and Casey Keehn and "there would not be a connection on paper between Southwell and Terry Keehn when Southwell gets out of jail."[68] The address of this apartment was 2131 W. 80th Avenue, Apartment 2.[69]

### 10. Keehn's vehicles and Southwell are spotted at Keehn's Anchorage address

Ingram drove by the 2131 W. 80th Avenue, Apartment 2, residence on January 13, 2016, and saw Southwell outside smoking a cigarette.[70] He also saw the 2008 red Ford F-250 pickup truck registered to Keehn parked in front of the apartment complex, as well as a Chevrolet Blazer registered to Southwell parked in parking space number two.[71]

### 11. Keehn's prior contacts with the criminal justice system

Ingram described Keehn's contact with the criminal justice system. These contacts included multiple arrests for violent crimes, sexual crimes, contempt of court, resisting arrest, property crimes, driving offenses (including a DUI), escape, and weapons offenses.[72] Ingram also

---

[65] *Id.*
[66] *Id.* at 12-13.
[67] *Id.* at 13.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

detailed Keehn's criminal record, which included a conviction for using a telephone to convey a threat, a felony burglary, a DUI, a deceptive practices conviction, interfering with a report of domestic violence, two misdemeanor assaults, and a domestic battery.[73]

### 12. Ingram's training and experience with the internet and sex trafficking

Ingram outlined his training and experience in sex trafficking investigations,[74] and opined that "it is common for pimps to utilize the internet to set up advertisements of the women to advertise them for the commercial sex trade" on Craigslist and on Backpage.com.[75] Ingram offered no information linking sex trafficking activity to drug trafficking or to drug use.

### 13. Ingram's search request

Based on all of the foregoing, Ingram asked to search 2131 W. 80th Avenue, Apartment 2, and the 2008 red Ford F-250: (1) for all electronic devices with internet capability, because such devices are used to facilitate prostitution related activities; (2) for drugs based on the two anonymous tips from January 2, 2016 that methamphetamine was in an upstairs bedroom at the Wasilla residence and the needle, meth pipe, and blood found on January 3, 2016, in the Soldotna hotel room; and (3) for guns because both Keehn and Southwell were convicted felons.[76]

### 14. Ingram's search request was granted

Alaska State District Court Judge Gregory Motyka granted Ingram's search warrant request and authorized the search of 2131 W. 80th Avenue, Apartment 2, and the 2008 red Ford F-250 for all electronic devices with internet capability, drugs, drug related material, and concealable firearms.[77]

---

[73] *Id.*
[74] *Id.* at 7.
[75] *Id.* at 12.
[76] *Id.* at 13-14.
[77] *Id.* at 1-3.

### 15. Results of the search

Ingram executed the search warrant on January 13, 2016.[78]  Pursuant to that warrant, he seized four laptops, two iPods, one Wi-Fi hotspot, one Micro SD card, a vial of testosterone, and some processed marijuana from Keehn's home.[79]  Pursuant to that warrant, he also seized three cell phones and an olive green backpack from Keehn's pickup truck.[80]  Ingram's search of the backpack uncovered methamphetamine, heroin, drug packaging material, and two digital scales.[81]  No weapons were found.[82]

## C.    Keehn's Motion and the Government's Response

### 1.    Keehn's motion

Keehn asks the Court to suppress all evidence derived from the warrant-authorized search of his home and his pickup truck.[83]  Keehn does not directly challenge the issuing magistrate's probable cause determination regarding drugs and drug related materials.  Instead, he argues that the warrant is flawed because it was based on unreliable, misleading, and stale information.  In particular, he asks for a *Franks* hearing because the misleading information allegedly included a material misstatement and several material omissions.[84]  Keehn asserts that the warrant violated his Fourth Amendment rights for several reasons.  First, Keehn contends that, if the material misstatement is stricken and if the material omissions are included, the issuing magistrate's probable cause determination is negated.[85]  Second, Keehn asks that the CS's

---

[78] *Id.* at 4.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Docket No. 38.
[84] *Id.* at 11-12, 18.
[85] *Id.* at 11-12.

allegation be excised from the warrant as unreliable.[86]   Third, Keehn asserts that his wife never consented to the seizure of Johnston's belongings, and the seizure of Johnston's belongings was outside the scope of the warrant.[87]   Fourth, Keehn argues that the information in Ingram's supporting affidavit was unconstitutionally stale.[88]   Finally, he contends that his post-arrest statement must be suppressed because it was tainted by the unconstitutional search of his home and his pickup truck.[89]

### 2.    The government's response

The government opposes Keehn's suppression request, as well as his request for a *Franks* hearing.[90]   The government contends that Keehn has failed to establish the requisite preliminary showing of deliberate or reckless misstatement or omission required for a *Franks* hearing.[91]   It asserts, without conceding, that if the affidavit included misleading information, that misleading information was not material to the probable cause determination.[92]   It argues that the CS's anonymous tip was sufficiently corroborated,[93] that Keehn's unsupported allegation that Casey Keehn did not consent to the seizure of Johnston's belongings is directly contradicted by Ingram,[94] that the information in the affidavit was not stale,[95] and that there was no Fourth Amendment violation to taint Keehn's post-arrest statements.[96]

---

[86] *Id.* at 12-16.
[87] *Id.* at 18-19.
[88] *Id.* at 21-22.
[89] *Id.* at 22-23.
[90] Docket No. 45.
[91] *Id.* at 12-18.
[92] *Id.* at 12-18, 21-23.
[93] *Id.* at 18-21.
[94] *Id.* at 23.
[95] *Id.* at 25-26.
[96] *Id.* at 26.

# IV. STANDARD OF REVIEW

Resolution of the lawfulness of this search, as well as the parties' competing claims regarding Ingram's search warrant application, implicates the following standards:

## A. Probable Cause

An issuing magistrate's probable cause determination must be affirmed if there is a "substantial basis for . . . conclud[ing]" probable cause existed.[97]  Probable cause exists whenever the totality of the circumstances establish "a fair probability that contraband or evidence of a crime will be found in a particular place."[98]

> The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same – and so are law enforcement officers.[99]

Thus, probable cause is "not readily, or even usefully, reduced to a neat set of rules."[100]  Instead, it is a "fluid concept – turning on the assessment of probabilities in particular factual contexts."[101]  Search warrants frequently are drafted "by nonlawyers (*sic*) in the midst and haste of a criminal investigation."[102]  "A grudging or negative attitude by reviewing courts toward warrants [would] tend to discourage police officers from submitting their evidence to a judicial officer before acting."[103]  Accordingly, the standard of review is "less probing than *de novo* review and shows deference to the issuing magistrate's determination."[104]

---

[97] *Jones v. United States,* 362 U.S. 257, 271 (1960) *overruled on other grounds by United States v. Salvucci,* 448 U.S. 83 (1980).

[98] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[99] *Id.* at 231.

[100] *Id.* at 232.

[101] *Id.*

[102] *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

[103] *Id.*

[104] *United States v. Hernandez,* 937 F.2d 1490, 1494 (9th Cir. 1991) (quoting *United States v. Angulo–López,* 791 F.2d 1394, 1396 (9th Cir. 1986)).

## B.      *Franks* Hearing

There is a presumption of validity with respect to an affidavit supporting a search warrant.[105]  A *Franks* hearing requires more than a mere allegation of bad faith.[106]  Instead, the Ninth Circuit has established five requirements for a *Franks* hearing:

> (1)      the defendant must allege specifically which portions of the warrant affidavit are claimed to be false [or which facts were omitted];
>
> (2)      the defendant must contend that the false statements or omissions were deliberately or recklessly made;
>
> (3)      a detailed offer of proof, including affidavits, must accompany the allegations;
>
> (4)      the veracity of only the affiant must be challenged; [and]
>
> (5)      the challenged statements must be necessary for probable cause.[107]

These requirements derive from *Franks v. Delaware.*[108]  *Franks* holds that the Fourth Amendment requires a hearing to test the veracity of a search warrant affidavit only when a defendant makes a **substantial preliminary showing** that a search warrant affidavit contained **material false statements**, made either deliberately or in reckless disregard to the truth, which, if excised, would negate the probable cause finding.[109]  Suppression is required if, at the *Franks* hearing, the defendant both establishes the alleged perjury or reckless disregard by a preponderance of the evidence, and demonstrates that, without the materially false information,

---

[105]  *Franks,* 438 U.S. at 155-56.
[106]  *United States v. Chesher,* 678 F.2d 1353, 1360 (9th Cir. 1982).
[107]  *United States v. Perdomo,* 800 F.2d 916, 920 (9th Cir. 1986) (quoting *United States v. DiCesare,* 765 F.2d 890, 894-95 (9th Cir. 1985)).
[108]  438 U.S. 154 (1978).
[109]  *Id.* at 155-56.

the warrant would not have issued.[110]  This holding has been extended to facts that are deliberately or recklessly omitted from a warrant application, which, if included, negate the probable cause determination.[111]

But a *Franks* hearing is not available for the asking.  Instead, the party requesting a *Franks* hearing must establish the material falsehood or the material omission by witness affidavit or by other reliable witness statements.[112]  If such support is missing, the *Franks* hearing applicant must satisfactorily explain why it is missing.[113]  Conclusory allegations or a desire to cross-examine the affiant will not support a *Franks* hearing request.[114]

## C.    Evidentiary Hearing

An evidentiary hearing is required whenever the movant "allege[s] facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."[115]  It is not enough for the movant to raise the issue and note the government's burden of proof.[116]

## D.    Inevitable Discovery and the Good Faith Exceptions

If a warrant lacks probable cause, evidence obtained during its execution ordinarily should be suppressed under the exclusionary rule.[117]  However, the exclusionary rule encompasses the following two exceptions.

---

[110]  *Id.* at 156.
[111]  *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir. 1985).
[112]  *Franks*, 438 U.S. at 171.
[113]  *Id.*
[114]  *Id.*
[115]  *United States v. Howell,* 231 F.3d 615, 620 (9th Cir. 2000) (citing *United States v. Harris,* 914 F.2d 927, 933 (7th Cir. 1990); *United States v. Walesak,* 783 F.2d 852, 857 (9th Cir. 1986); *United States v. Irwin,* 612 F.2d 1182, 1187 n. 14 (9th Cir. 1980); *United States v. Carrion,* 463 F.2d 704, 706 (9th Cir. 1972)).
[116]  *Howell,* 231 F.3d at 620-21.
[117]  *United States v. Underwood,* 725 F.3d 1076, 1084 (9th Cir. 2013) (citing *Mapp v. Ohio,* 367 U.S. 643, 655 (1961); *Weeks v. United States,* 232 U.S. 383, 393 (1914)).

### 1. Inevitable discovery doctrine

First, under the inevitable discovery doctrine, the exclusionary rule does not require suppression if the prosecution can establish by a preponderance of the evidence that, despite the Fourth Amendment violation, the challenged evidence would have been ultimately or inevitably discovered by lawful means.[118]

### 2. Good faith exception

Second, the exclusionary rule does not apply to evidence seized pursuant to a defective search warrant where the police officer acts in objectively reasonable reliance on the issuing magistrate's probable cause determination.[119] The good faith exception precludes suppression unless the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[120]

## V. ANALYSIS

For all the reasons set forth below, this Court denies Keehn's Motion for a *Franks* hearing at Docket No. 40 and respectfully recommends that the District Court, after independent review, deny the Motion to Suppress at Docket No. 38. In particular, this Court concludes that:

- a *Franks* hearing is not warranted because Keehn has failed to make a substantial preliminary showing that Trooper Ingram's supporting affidavit deliberately or recklessly contained material falsehoods or material omissions impacting the probable cause determination;

- the issuing magistrate properly relied on the CS's anonymous tip because it was sufficiently corroborated by independent police investigation;

- the information the issuing magistrate relied on was not stale;

- although Ingram's supporting affidavit did not establish probable cause to search Keehn's residence and vehicle for drugs, drug paraphernalia, or

---

[118] *United States v. Merriweather,* 777 F.2d 503, 506 (9th Cir. 1985) (citing *Nix v. Williams,* 467 U.S. 431 (1984)).

[119] *Underwood,* 725 F.3d at 1085 (citing *United States v. Leon,* 468 U.S. 897, 922-23 (1984)).

[120] *Id.* (quoting *Leon,* 468 U.S. at 922-23).

concealable firearms, it did establish probable cause to search for cell phones, computers, and other electronic devices with internet access capability;

- suppression of the drugs and drug paraphernalia is not required because the undisputed facts establish that the drugs and drug paraphernalia would have been inevitably discovered during a lawful search of the olive green backpack for cell phones, computers, and other electronic devices with internet access capability;

- in the alternative, suppression of the drugs and drug paraphernalia is not required because Ingram's supporting affidavit, as it relates to the drugs and drug paraphernalia, was not so lacking in indicia of probable cause as render official belief in its existence entirely unreasonable;

- Keehn has not alleged facts with sufficient definiteness and clarity to require an evidentiary hearing on whether (1) Johnston's belongings contained exculpatory evidence, (2) Casey Keehn did not consent to the seizure of Johnston's belongings, and (3) his post-search statements were the product of a Fourth Amendment violation.

What follows is this Court's rationale for these conclusions.

## A.     Keehn Has Failed to Establish a Basis for a *Franks* Hearing

Keehn contends Ingram deliberately or recklessly misstated a material fact and omitted material facts from the warrant application.[121]   Keehn argues that if the material misstatement is stricken and the material omissions are included, the issuing magistrate's probable cause determination is negated.[122]   Keehn identifies the material misstatement as Ingram's description of Scott Hagy's self-identification as Johnston's stepfather.[123]   Keehn identifies the three material omissions as (1) an alleged improper demand by Ingram to Keehn before the search warrant was issued that Johnston's belongings be returned to Hagy;[124] (2) an alleged improper seizure by Ingram of Johnston's belongings during execution of the search warrant;[125] and

---

[121] Docket No. 38 at 11-12.
[122] *Id.*
[123] *Id.* at 16-17.
[124] *Id.* at 18.
[125] *Id.* at 18-19.

(3) Ingram's alleged failure to catalogue the absence of "any indication of illegal conduct" during law enforcement's "numerous trips to the various residences."[126]

Keehn supports his request for a *Franks* hearing with his counsel's sworn declaration which avers only, "[t]o the best of my knowledge and belief, there is no relation between Scott Hagy and Sara Johnston."[127] Keehn does not offer factual support for any of his material omission allegations.

On these facts, this Court concludes that a *Franks* hearing is not warranted because Keehn has failed to make a substantial preliminary showing that Ingram's supporting affidavit deliberately or recklessly contained material falsehoods or material omissions impacting the probable cause determination.

### 1. It is Ingram's veracity and not Hagy's that matters in a *Franks* hearing request

The question presented with any *Franks* hearing request is whether the affiant deliberately or recklessly misled the issuing magistrate. It is the veracity of the affiant that matters, not the veracity of the hearsay informant.

> When the Fourth Amendment demands a factual showing sufficient to comprise probable cause [in connection with a *Franks* hearing request], the obvious assumption is that there will be a truthful showing. This does not mean truthful in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true.[128]

Thus, even if Hagy misstated his relationship with Johnston (and this is not clear from the record), it is Ingram's veracity and not Hagy's, that matters when determining whether Keehn is entitled

---

[126] *Id.* at 18.
[127] Docket No. 39 at 1.
[128] *Franks*, 438 U.S. at 164-65 (emphasis, citation, and quotation marks omitted).

to a *Franks* hearing.  In this instance, a *Franks* hearing is not appropriate without a further showing that Ingram deliberately or recklessly included the alleged falsehood in his affidavit.[129]  Here, counsel's supporting declaration challenged only Hagy's veracity, and then only on information and belief.  No reason is proffered for doubting Ingram's veracity when he relates Hagy's self-identification as Johnston's stepfather.  A challenge to Hagy's veracity alone does not constitute the substantial preliminary showing needed for a *Franks* hearing.

### 2. Keehn has failed to establish the alleged omissions

Next, Keehn offers no support for his claim that Ingram demanded that Keehn return Johnston's property to Hagy either before applying for the search warrant or while executing the warrant.  Indeed, the government proffers Ingram's sworn declaration denying any contact with Keehn before execution of the warrant, and a contemporaneous memorandum describing how Johnston's property was retrieved from Keehn's home.[130]  Ingram avers that he had no direct or indirect contact with Keehn before service of the search warrant, and his contemporaneous memorandum indicates that Keehn's wife gave him permission to retrieve Johnston's belongings.[131]

Likewise, Keehn offers no support for his claim that Ingram failed to tell the issuing magistrate about the absence of "illegal conduct" during the numerous law enforcement visits at "the various residences."[132]  Indeed, Keehn's claim is inconsistent with the content of Ingram's affidavit.  For example, Ingram described Keehn's three non-criminal contacts with the Wasilla

---

[129] *Perdomo*, 800 F.2d at 921.
[130] Docket Nos. 45-2; 45-3.
[131] *Id.*
[132] Docket No. 38 at 18.

police and the Kenai police.[133]   He also included Southwell's denial that she engaged in prostitution related activities despite knowing Keehn.[134]

What Keehn seems to be asking for is a *Franks* hearing to determine whether these omissions "possibly misled the issuing judge."[135]   But, as we have seen, this does not constitute the substantial preliminary showing required for a *Franks* hearing under controlling Supreme Court and Ninth Circuit authority.

### 3. The alleged misstatement and omissions are not material

Even if Keehn substantially established the alleged misstatement and the alleged omissions, which he has not, his request still would be denied because the misstatement and the omissions simply were not material to the probable cause determination.   A substantial preliminary showing of recklessness or deliberate falsity is meaningless under *Franks*, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause."[136]   In this instance, even without the alleged misstatement and the three alleged omissions, this Court finds there is an abundance of probable cause to support the search of Keehn's home and pickup truck for computers, cell phones, and any other electronic devices that have internet capability for the following reasons.

#### a. Hagy's relationship with Johnston was not material to the probable cause determination in this case

An FBI Agent provided Ingram with an anonymous tip from a CS about threatening and harassing behavior by a man allegedly involved in sex trafficking activity from Keehn's cell

---

[133]   Docket No. 38-1 at 8-10.
[134]   *Id.*
[135]   Docket No. 38 at 18.
[136]   *Chesher,* 678 F.2d at 1362 (quoting *Franks* 438 U.S. at 171-72).

phone.[137]  Hagy reported that Keehn was running a prostitution enterprise and that Johnston had

died in an automobile accident while returning from a "date" arranged by Keehn.[138]  Hagy also

related that Ashley Hunter admitted working as a prostitute for Keehn and that Keehn used the

Kinzi Circle address for "in call" prostitution related activities.[139]

Cell phone texts confirmed that the text messages were sent from Keehn's cell

phone to Johnston's sister after Johnston's death.  The texter indicated that Johnston lived with

Keehn.[140]  A review of Johnston's SIM card confirmed that her contacts included phone numbers

for Keehn and his wife.[141]  Finally, recorded phone calls between Keehn and Southwell about

"turning tricks," "hookers," his business, and "his Anchorage girls coming over to his place in a

minute to show them everything they need to know about going on line," all corroborated tips from

the CS and Hagy, as well as Keehn's alleged association with prostitution.[142]  Keehn's assertion

during the jail calls that he was "giving it up," even if true, does not obviate the corroborative value

of the recorded phone calls.

Regardless, Hagy's relationship to Johnston is immaterial to the probable cause

determination in this case.

> **b.** **The failure to reference the alleged improper seizure of Johnston's belongings or non-criminal conduct during police visits to Keehn's residences was not material to the probable cause determination in this case**

Putting aside the absence of any affidavits or other proffers establishing the alleged

omissions, any impropriety related to the seizure of Johnston's belongings, or any lack of criminal

---

[137]  Docket No. 38-1 at 8.
[138]  *Id.* at 10.
[139]  *Id.*
[140]  *Id.*
[141]  *Id.* at 11.
[142]  *Id.* at 11-12.

conduct during police visits with Keehn is not material to whether probable cause existed for the search of Keehn's residence for computers, cell phones, or other electronic devices for evidence of sex trafficking.

### 4. This Court concludes that Keehn has failed to make the required substantial preliminary showing necessary for a *Franks* hearing

For these reasons, this Court denies his request at Docket No. 40 for a *Franks* hearing. Keehn has failed to make a substantial preliminary showing that Ingram's affidavit contained misstatements or omissions that were material to the issuing magistrate's probable cause determination.

## B. The CS's Anonymous Tip was Corroborated by Independent Police Investigation

Keehn asserts that the CS's anonymous tip to the FBI Agent should be excised from the affidavit as unreliable. Keehn contends that the CS's tip was not sufficiently corroborated, and that the probable cause determination in this instance relied too much on the word of an unknown and unreliable informant.[143]

Keehn's argument might have some weight if the issuing magistrate relied exclusively on the CS's anonymous tip.[144] But that is not what happened here. There is nothing in the law that precludes the police from pursuing an investigation based on an anonymous tip, as long as it is corroborated.

> [T]he veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable . . . Yet, such tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise perfect crimes. While a conscientious assessment of the basis for crediting such tips is

---

[143] Docket No. 38 at 12-16.

[144] The Court readily accepts Keehn's characterization that the CS's tip was anonymous. Docket No. 38 at 15; *See also United States v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001) (tip considered anonymous where it is unclear whether the source was known or unknown); *United States v Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (FBI tip to police considered anonymous because the tip did not include the identity of the source or fact supporting the tip).

required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not.[145]

Here, a CS alleged that a prostitute was threatened and harassed by a man engaged in sex trafficking activity. Ingram corroborated the CS's anonymous allegation that there was a man engaged in sex trafficking activity near Wasilla with assertions by Scott Hagy and Ashley Hunter, with the SIM card search results, with the recorded phone calls between Keehn and Southwell, and finally with Keehn's use of the number (907) 795-3148.

Under these circumstances, there is no basis to excise the CS's anonymous allegation from the supporting affidavit. It was perfectly proper for the issuing magistrate to consider the anonymous allegation in conjunction with the other information developed during Ingram's independent investigation that corroborated the CS's tip about a man involved in sex trafficking activity.

## C.    The Information in Ingram's Supporting Affidavit was not Stale

Keehn contends that the warrant violated the Fourth Amendment because the information the issuing magistrate relied upon was stale. Generally speaking, the information contained in a supporting affidavit must be current enough to demonstrate that probable cause exists at the time of the search.[146] The supporting affidavit must be based on facts "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."[147]

But, as the government readily demonstrates, the mere lapse of time does not control the staleness analysis.[148] Instead, staleness must be evaluated "in light of the particular

---

[145] *Gates,* 462 U.S. at 237-38.
[146] *United States v. Lacy,* 119 F.3d 742, 745 (9th Cir. 1997).
[147] *Id.* (citing *Durham v. United States,* 403 F.2d 190, 193 (9th Cir. 1968) (quoting *Sgro v. United States,* 287 U.S. 206, 210 (1932))).
[148] *United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir. 1993).

facts of the case and the nature of the criminal activity and property sought."[149]   When "the evidence sought is of an ongoing criminal business . . . greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time."[150]

Here, only three months elapsed between the initial anonymous tip about alleged sex trafficking activity in Wasilla and Ingram's search warrant application.  In the two weeks immediately preceding the warrant application, Ingram averred that he listened to recorded calls where Keehn discussed "turning tricks," "hookers," and "having his Anchorage girls coming over to his place . . . to show them everything they need to do online . . . so he does not have to do it anymore."[151]  These recordings readily corroborate the information supplied by the CS's tip, by allegations from Hagy and from Hunter, and by the results of the SIM card search of Johnston's phone.

For all these reasons, the information contained in the supporting affidavit used by the issuing magistrate to evaluate Ingram's request to search Keehn's home and pickup truck for cell phones, computers, and other devices with internet capability for evidence of sex trafficking constitutionally was not stale.

**D.    The Search for Drugs, Drug Related Materials, and Concealable Firearms was not Supported by Probable Cause**

The issuing magistrate's finding of probable cause is entitled to great deference and his determination must be accepted if, under the totality of the circumstances, there was a fair probability that drugs, drug related material, and concealable firearms would be found in Keehn's

---

[149]   *Id.* (quoting *United States v. Greany,* 929 F.2d 523, 525 (9th Cir. 1991)).
[150]   *United States v. Vaandering,* 50 F.3d 696, 700 (9th Cir. 1996) (quoting *Greany,* 929 F.2d at 525)).
[151]   Docket No. 38-1 at 12.

home or in his pickup truck.[152]  The Court finds that Ingram's warrant affidavit does not support a finding of probable cause that drugs, drug related material, or firearms would be found.

A careful reading of the supporting affidavit in the light most favorable to sustaining the probable cause determination reveals only three facts to support a probable cause finding to search Keehn's pickup truck and residence for drugs and drug related materials.  The first is a tip from two unnamed individuals of unknown reliability on January 2, 2016, who alleged methamphetamine was in an upstairs bedroom at Keehn's prior Wasilla address.[153]  The second is a tip from a January 4, 2016 report by the cleaning staff from a Soldotna hotel who found "evidence of drug use (used needles and a broken meth pipe) along with blood" in a room rented to Keehn and his wife.[154]  The third fact is that a convicted drug felon was living with the Keehns following her January 8, 2016 release from custody for an undescribed probation violation.[155]

Uncorroborated hearsay information from anonymous tipsters is entitled to little or no weight if the information is entirely uncorroborated and lacks any indication of reliability.[156]  Here, Ingram's supporting affidavit offered no basis for the issuing magistrate as to the "basis of knowledge" or the "veracity" of the two anonymous tipsters.[157]  The mere presence of a housemate with a felony drug conviction, even one recently released for an unexplained probation revocation, does not corroborate the anonymous tips.  Was the revocation for drug use or drug sales; was the revocation for a minor technical violation; was the revocation petition even pursued?  While a report of drug use and drug paraphernalia found ten days earlier in a hotel room has some

---

[152] *Gates,* 462 U.S. at 238.
[153] Docket No. 38-1 at 9.
[154] *Id.* at 12.
[155] *Id.* at 14.
[156] *United States v. Clark,* 31 F.3d 831, 834 (9th Cir. 1994).
[157] *See Gates,* 462 U.S. at 237-38 (discussing the issuing magistrate's continuing obligation to assess the veracity and basis of knowledge of the person supplying the anonymous tip).

corroborative value, it does not sufficiently corroborate a probability that drugs or drug related material will be found in a pickup truck and residence more than a 100 miles from the hotel room.

Moreover, Ingram claimed extensive experience investigating sex trafficking crimes.[158]  However, he offered no information that enabled the issuing magistrate to independently evaluate any claim linking sex trafficking to drug use or drug sales.  Likewise, Ingram claims extensive experience investigating drug trafficking activity, but still fails to offer any information to enable the issuing magistrate to independently assess the probability that drugs or drug related materials likely would be found in a pickup truck and residence more than 100 miles away.

Similarly, a careful reading of the supporting affidavit in the light most favorable to sustaining the probable cause determination reveals only one basis for the issuing magistrate's finding of probable cause to search the residence for concealable firearms — the status of Ingram and Southwell as convicted felons.  Ingram's supporting affidavit contains absolutely no other information, anonymous or otherwise, suggesting any probability that concealable firearms would be found in Keehn's home or vehicle.

## E.      Inevitable Discovery and the Good Faith Exception Preclude the Exclusionary Rule

In sharp contrast, Ingram's request to search Keehn's home and pickup truck for cell phones, computers, and other electronic devices with internet access capability was amply supported by probable cause.  The issuing magistrate knew that Ingram was a twelve year veteran of the Alaska State Troopers with extensive experience investigating a variety of crimes, including crimes associated with sex trafficking.[159]  He knew from Ingram that devices used to connect to

---

[158]  Docket No. 38-1 at 7.
[159]  Id.

the internet frequently are used in sex trafficking crimes.[160]  He learned of an anonymous tip from a CS that a man had threatened and harassed a prostitute for working in Wasilla without his consent.[161]  Ingram told the issuing magistrate that the harassment described in the anonymous tip was linked to Keehn's cell phone;[162] that Scott Hagy accused Keehn of running a prostitution enterprise; that Sara Johnston worked for Keehn as a prostitute;[163] that Keehn admitted that Johnston lived with him;[164] that a self-proclaimed prostitute confirmed to Hagy that Johnston worked for Keehn as a prostitute;[165] that Johnston's cell phone confirmed that Johnston had Keehn's contact information;[166] that Keehn's recorded phone calls with Southwell discussed "turning tricks," "hookers," and "his girls"; and that Southwell would be living with Keehn and his wife immediately after her release from custody.[167]  All of this information enabled the issuing magistrate to independently evaluate Ingram's claim that probable cause existed to search Keehn's home and pickup truck for cell phones, computers, and other devices with internet capability for evidence of sex trafficking.

In *United States v. Ross*,[168] the Supreme Court held that a lawful search of a premises extends to the entire area where the objects to be searched for might be found.[169]  The search "is not limited by the possibility that separate acts of entry or opening may be required to complete the search."[170]  Thus, a warrant that authorizes law enforcement to search a residence or

---

[160] *Id.* at 14.
[161] *Id.* at 8.
[162] *Id.*
[163] *Id.* at 10.
[164] *Id.*
[165] *Id.*
[166] *Id.* at 10, 11.
[167] *Id.* at 12.
[168] 456 U.S. 798 (1982).
[169] *Id.* at 820.
[170] *Id.* at 820-21.

a vehicle for certain objects "also provides authority to open closets, chests, drawers, and containers" in which those objects might be found.[171]

> When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home. . . must give way to the interest in the prompt and efficient completion of the task at hand. This rule applies equally to all containers, as indeed we believe it must.[172]

In the present case, law enforcement was tasked with searching Keehn's home and pickup truck for cell phones, computers, and other devices with internet capability for evidence of sex trafficking. It was reasonable for them to believe that these items might be concealed in the olive green backpack found in Keehn's pickup truck.

The inevitable discovery doctrine precludes application of the exclusionary rule in this case when the government can prove by a preponderance of the evidence that, despite the absence of probable cause to search for drugs or drug related material, the drugs inevitably would have been discovered by lawful means.[173] Ingram's search warrant return establishes that the drugs and drug related materials were discovered during a search of the olive green backpack found in Ingram's pickup truck.[174] Law enforcement was lawfully allowed to search the backpack for cell phones, computers, and other devices with internet capability for evidence of sex trafficking. Under these circumstances, this Court finds that the discovery of the methamphetamine and the heroin in the backpack was inevitable and protected from suppression by the inevitable discovery doctrine. The Court bases this finding on Ingram's search warrant return, which indicates that the

---

[171] *Id.* at 821.
[172] *Id.* at 821-22.
[173] *Merriweather,* 777 F.2d at 506.
[174] Docket No. 38-1 at 4.

olive green backpack contained methamphetamine, heroin, drug packaging materials, and two digital scales.[175]

In addition, and in the alternative, this Court finds that the good faith exception to the exclusionary rule precludes suppression of the drugs and the drug related evidence found in the olive green backpack. Evidence obtained under an invalid warrant should not be suppressed if the officers obtaining the warrant and performing the search relied in good faith on the warrant's validity.[176] "The inquiry is one of objective reasonableness . . . whether a reasonably well-trained officer would have known that this particular search warrant was illegal despite the magistrate judge's authorization."[177]

While this Court has determined that this warrant did not lawfully authorize the search of Keehn's home and pickup truck for drugs and drug related material, it was not entirely unreasonable for Ingram to rely on the issuing magistrate's contrary determination. Evidence of drug use and drug paraphernalia was found in a Soldotna hotel room rented to Keehn and his wife just ten days earlier. Two anonymous tipsters claimed that Keehn's Wasilla residence contained methamphetamine eleven days earlier. Finally, a convicted drug felon recently moved into Keehn's Anchorage residence. This information was sufficient to allow an objectively reasonable law enforcement officer to believe there was probable cause to search for drugs and drug related material pursuant to the warrant. Moreover, the warrant was not facially deficient; Ingram did not mislead the magistrate; and there is no indication that the magistrate abandoned his judicial role.[178]

For this additional and alternative reason, the exclusionary rule does not require suppression of the drugs and drug related material found in the olive green backpack.

---

[175] *Id.*
[176] *Clark,* 31 F.3d at 835 (citing *United States v. Mendonsa,* 989 F.2d 366, 369 (9th Cir. 1993)).
[177] *Id.* (citing *Leon,* 468 U.S. at 922 n.23).
[178] *Id.*

**F.     Keehn has not Established the Need for an Evidentiary Hearing on the Issue of his Wife's Alleged Consent to the Seizure of Johnston's Belongings**

Finally, framing the issue as a scope question, Keehn contends that Ingram exceeded the scope of the warrant by seizing items allegedly belonging to Johnston.[179]   However, what he outlines factually is a seizure pursuant to a purported consent by Casey Keehn, the defendant's wife.[180]   But Keehn does not discuss the law of consent, nor does he request an evidentiary hearing on the question of Casey Keehn's consent.   Finally, and most importantly, he fails to include a sworn declaration from Casey Keehn attesting to the claim that she did not consent to the seizure.

The government opposes Keehn's description of the events surrounding the seizure of Johnston's belongings, and contends that Casey Keehn freely and voluntarily consented to the seizure.   In particular, the government asserts that Keehn's "naked unsupported allegation" is directly contradicted by Ingram's contemporaneously prepared supplemental report describing his rationale for seizing Johnston's belongings.

> Further, I had Casey Keehn enter the apartment to show me where
> Sara Johnston's personal items were located.  She pointed to a box
> in the living room and gave me permission to seize [Sara Johnston's]
> belongings.[181]

Of course, a seizure is unconstitutional when it is not authorized under the terms of a validly issued warrant or when the seizure is not exempted from the warrant requirement.[182] Although Keehn asked for a *Franks* hearing in connection with his challenge to the warrant, he never requested an evidentiary hearing in connection with his lack of consent/scope of the warrant

---

[179]   Docket No. 38 at 18-21.
[180]   *Id.*
[181]   Docket No. 45-3.
[182]   *United States v. Ewain,* 88 F.3d 689, 693 (9th Cir. 1996) (quoting *Horton v. California,* 496 U.S. 128, 140-41 (1990)).

challenge. Moreover, and more importantly, Keehn failed to provide a sworn declaration from Casey Keehn so this Court actually could determine whether a genuinely contested issue of fact exists.[183] Without a sworn declaration from Casey Keehn, this Court is unwilling to conduct an evidentiary hearing, particularly when the issue is framed as a seizure exceeding the scope of the warrant.[184] Under these circumstances, this Court concludes that Keehn has not alleged facts with sufficient definiteness and clarity to require an evidentiary hearing on the question of Casey Keehn's alleged lack of consent to the seizure of Johnston's belongings.

## VI. CONCLUSION

Based on the foregoing analysis, this Court concludes that Keehn has failed to establish a substantial preliminary showing needed for a *Franks* hearing. Keehn has not demonstrated that Sergeant Ingram's search warrant application contained misstatements or omissions made either deliberately or recklessly. Nor has he established that alleged misstatement and omissions, individually or cumulatively, were material to the issuing magistrate's probable cause determination. Consequently, this Court denies Keehn's request for a *Franks* hearing at Docket No. 40.

This Court likewise denies any suggestion that an evidentiary hearing is necessary to resolve Casey Keehn's alleged lack of consent to Ingram's seizure of Johnston's belongings. Keehn has failed to allege facts with sufficient definiteness, clarity, and specificity for this Court to conclude that there is a contested issue of fact to be resolved.

Finally, this Court recommends that the District Court, after independent review, deny Keehn's motion to suppress evidence at Docket No. 38. Although Ingram's affidavit failed to demonstrate probable cause to search Keehn's home and pickup truck for drugs and for drug

---

[183] *Howell,* 231 F.3d at 620.
[184] Docket No. 38 at 18.

related materials, it readily demonstrated abundant probable cause to search for cell phones, computers, and other electronic devices with internet access capability as evidence related to sex trafficking. There is no basis to excise the anonymous tip by the CS from Ingram's application because it was sufficiently corroborated by independent police investigation. The information supporting the warrant was not stale, and there is no basis to suppress Keehn's post-arrest statements because the seizure of the drugs and drug related material was lawful.

Finally, despite the invalid authorization to search for drugs and drug related materials, the inevitable discovery doctrine and the good faith exception preclude suppression of the drugs and drug related material found in the olive green backpack. The undisputed record establishes that the drugs and the drug related materials inevitably would have been discovered pursuant to the authorization to search for cell phones, computers, and other electronic devices with internet access capability. In the alternative, the authorization to search for drugs and drug related materials was not so deficient as to preclude objectively reasonable officers from relying on the issuing magistrate's authorization.

DATED this 23rd day of May, 2016, at Anchorage, Alaska.


_____
/s/ Kevin F. McCoy
Kevin F. McCoy
United States Magistrate Judge


Pursuant to Fed. R. Crim. P. 59(b)(2) and D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this final finding and recommendation shall file written objections with the Clerk of Court no later than the **CLOSE OF BUSINESS** on **June 6 2016**. Pursuant to Fed. R. Crim. P. 59(b)(3), objections will be considered first by the District Court Judge, who will then accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. *Miranda v. Anchondo, et al.*, 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).

Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before the **CLOSE OF BUSINESS** on **June 13, 2016**. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).